IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CANDICE LEWIS,

       Petitioner,               No. 2:11-cv-0423 LKK EFB P

     vs.

WALTER MILLER,

       Respondent.         <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

      Petitioner is a state prisoner proceeding through counsel with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. She challenges a 2008 judgment of conviction entered against her in the Sacramento Superior Court on charges of first degree murder with the special circumstance that the murder was committed during the course of a robbery; second degree robbery; attempted use of a forged access card; and use on four occasions of a forged access card. She seeks relief on the grounds that: (1) her Fourteenth Amendment right to due process was violated by the admission into evidence of her statements to police; (2) the admission into evidence of statements by her co-defendant's brother violated her Sixth Amendment right to confrontation of the witnesses against her; (3) her sentence constitutes cruel and unusual punishment; (4) her trial and appellate counsel rendered ineffective assistance; and (5) the cumulative effect of errors at her trial violated her right to due process.

1    Upon careful consideration of the record and the applicable law, the undersigned

2  recommends that petitioner's application for habeas corpus relief be denied.

3  **I.    Factual Background[1]**

4    Defendant Candice Lewis and codefendant Eric Ramsey lured a
       62-year-old victim to an area where they robbed him of his money
5      and car and killed him by either strangling him or running him
       over with his car.  They then used or attempted to use his credit
6      card at various locations.  Tried in front of dual juries, defendant
       and Ramsey were found guilty of first degree murder, second
7      degree robbery, attempted use of a forged access card, and use on
       four occasions of a forged access card.[2]  Defendant's jury found a
8      felony-murder special circumstance to be true.

9      Sentenced to prison for 25 years to life, defendant appeals.[3]  She
       contends the court should have excluded her statements during an
10     initial interview with police as well as her statements thereafter,
       that is, statements made during a recorded conversation with
11     Ramsey at the police station, their joint interview with the police,
       and their interview with the police at the crime scene.  She claims
12     that in the initial interview with the police, she did not voluntarily
       waive her rights pursuant to *Miranda v. Arizona* (1966) 384 U.S.
13     436.  She also claims that her statements were involuntary.  We
       reject her claims and affirm the judgment.
14
15     **FACTUAL AND PROCEDURAL BACKGROUND**

16     On August 31, 2006, Detective Michael Lange interviewed
       defendant at the police station.  The interview was recorded and
       shows the following:
17
18     Defendant, who is young and pregnant, waits in a room for about
       an hour before the interview begins.[4]  About 40 minutes into her
19     wait, she is upset and knocks on the door.  She wants to see a
       nurse, complaining that the baby is kicking.  She explains the baby
20     kicks when she feels stress.  The detective lets her leave the room
       to walk around.  She returns a short time later and says she is
21     better.  Defendant asks if the detective has spoken with her mother.

22     [1]  In its unpublished memorandum and opinion affirming petitioner's judgment of
23  conviction on appeal, the California Court of Appeal for the Third Appellate District provided
    the following factual summary.

24     [2]  This appeal only involves defendant Lewis.

25     [3]  This appeal only involves defendant Lewis.

26     [4]  Defendant was 16 years old and five months pregnant at the time of the interview.

The detective responds that he had spoken with defendant's mother, that she knew that defendant was at the police station, and that she went to church but planned to return.  Defendant did not ask to see or talk to her mother and responded, "Okay," to the detective's explanation.  The detective then returns to start the interview.  He states, "I have to read you your rights since you're down here at the police station."  "I'm gonna read those rights to you and then we can – and move on and talk."  Defendant [sic] then reads defendant her rights pursuant to *Miranda*.  Defendant responds "Un-huh" or nods affirmatively after each right.  More than an hour into the interview, during which defendant is caught in one lie after another and confesses to the crimes, she asks if she is going to be able to talk to her mother.  The detective responds that defendant's mother plans to call when she is finished at church. Defendant responds, "Oh, she's still in church?"  The detective states that defendant's mother planned to call and he needed to leave to check his messages.  Defendant states, "Okay." The detective returned and informed defendant that he and defendant's mother had traded messages.  The detective then brings up an allusion defendant had made earlier that it was Ramsey's plan to rob the victim.  Defendant states that while Ramsey mentioned such a plan, he never told her the details, and she assumed it was just talk.  The detective then tells her that Ramsey told another officer she was the mastermind.  The detective then tells defendant to think about that while he leaves the room to respond to a call from defendant's mother.  He steps into the hall. When he returns, he tells defendant that her mother is concerned about defendant and the baby.  The officer reiterates that Ramsey is "putting most of this on you."  Defendant denies it was her idea. At the end of the interview, the detective has defendant write a letter of apology to the victim's family.  Defendant asks if her mother was coming to the police station.  The detective responds that defendant's mother will not be coming immediately but "know[s] what's going on." Defendant responds, "Okay."

Apparently, while defendant was being interviewed by Detective Lange, Ramsey was interviewed by Detective Pat Higgins.  After their individual interviews, defendant and Ramsey were interviewed together.  Later, they sat together in the interview room with the tape running unbeknownst to them.  Subsequently, they led the detectives to the crime scene where the interviews continued.  Defendant was then transported to juvenile hall.

Prior to trial, defendant filed an in limine motion "to not allow [defendant]'s statement to law enforcement and all fruits of the statement."

After a hearing, the court found defendant understood her *Miranda* rights and waived them.  The court therefore denied defendant's motion to suppress the statements.

3

1   Dckt. 19-1 at 2-5.

2   **II.   Procedural Background**

3           After the California Court of Appeal affirmed her judgment of conviction, petitioner filed

4   a petition for review in the California Supreme Court.  Resp.'s Lodg. Doc. 5.  Therein, she

5   claimed that the trial court erred in denying her motion to suppress her statements to police.  *Id.*

6   On November 19, 2009, that petition was summarily denied.  Resp.'s Lodg. Doc. 6.

7           On February 18, 2010, petitioner, proceeding in pro per, filed a petition for writ of habeas

8   corpus in the Sacramento County Superior Court (Case No. 10F01060), claiming that the trial

9   court improperly denied her motion to suppress her statements to police; and that the

10  combination of her trial counsel's ineffective assistance, "cumulative error," and "prejudicial

11  error by the court" violated her right to due process.[5]  Resp.'s Lodg. Doc. 7.  By order dated

12  April 6, 2010, the Superior Court denied that petition on the grounds that petitioner's claim

13  regarding her statements to police had been raised and rejected on appeal, and her claim of

14  ineffective assistance of counsel was unsupported by any specific factual allegations.  Resp.'s

15  Lodg. Doc. 8.

16          On February 3, 2011, petitioner, now proceeding through counsel, filed another petition

17  for writ of habeas corpus in the Sacramento County Superior Court (Case No. 11F00682).

18  Resp.'s Lodg. Doc. 9.  Therein, she claimed that: (1) the admission into evidence of statements

19  by her co-defendant's brother violated her Sixth Amendment right to confrontation of the

20  witnesses against her; (2) her sentence constitutes cruel and unusual punishment, in violation of

21  the Eighth Amendment; (3) her trial and appellate counsel rendered ineffective assistance; and

22  (4) the cumulative effect of the errors at her trial violated her Fourteenth Amendment right to

23  due process.  *Id.*  By order dated March 7, 2011, the Superior Court denied that petition on the

24  grounds that it was an impermissible successive petition, that it was untimely, that it sought to

25  _____

26          [5] Petitioner informs the court that this petition was filed by her mother, who signed the
    petition on her behalf.  Dckt. 2-1 at 7-8.

                                                    4

1  raise issues which could and should have been raised on appeal, and that the claims contained

2  therein lacked merit in any event.  Resp.'s Lodg. Doc. 10.

3        Petitioner subsequently filed a petition for writ of habeas corpus in the California Court

4  of Appeal, raising the same four claims that she raised in her second habeas petition filed in the

5  Superior Court.  Dckt. 14-1 at 2-52.  By order dated May 12, 2011, the Court of Appeal

6  summarily denied that petition "on the merits," without issuing an order to show cause.  Dckt.

7  14-2.  On May 18, 2011, petitioner filed a petition for review in the California Supreme Court,

8  raising the same four claims.  Dckt. 14-3.  The Supreme Court ordered respondent to file an

9  answer to the petition, in which he should address:

> Whether petitioner established a prima facie case for relief, such
> that this court should grant the petition for review, and transfer the
> matter to the Court of Appeal with instructions to issue an order to
> show cause.

13  Resp.'s Lodg. Doc. 17, at 1.  After respondent filed his answer, the California Supreme Court

14  summarily denied the petition for review.  *Id.* at 2.

15        Petitioner commenced the instant action by filing a petition for writ of habeas corpus in

16  this court on February 14, 2011.

17  **III.   Standards for a Writ of Habeas Corpus**

18        An application for a writ of habeas corpus by a person in custody under a judgment of a

19  state court can be granted only for violations of the Constitution or laws of the United States.  28

20  U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

21  application of state law.  *See Wilson v. Corcoran*, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010);

22  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir.

23  2000).

24  ////

25  ////

26  ////

5

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the state court decision. *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (*citing Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). Nonetheless, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." *Stanley*, 633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[6] *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ

---

[6] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

1   simply because that court concludes in its independent judgment that the relevant state-court

2   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

3   application must also be unreasonable." *Williams*, 529 U.S. at 412.  *See also Schriro v.*

4   *Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal

5   habeas court, in its independent review of the legal question, is left with a 'firm conviction' that

6   the state court was 'erroneous.'").  "A state court's determination that a claim lacks merit

7   precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness

8   of the state court's decision." *Harrington v. Richter*, 562 U.S.___,___,131 S. Ct. 770, 786

9   (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a

10  condition for obtaining habeas corpus from a federal court, a state prisoner must show that the

11  state court's ruling on the claim being presented in federal court was so lacking in justification

12  that there was an error well understood and comprehended in existing law beyond any possibility

13  for fairminded disagreement." *Harrington*,131 S. Ct. at 786-87.

14      If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

15  court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*,

16  527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)

17  (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

18  § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

19  considering de novo the constitutional issues raised.").

20      The court looks to the last reasoned state court decision as the basis for the state court

21  judgment.  *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

22  If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

23  previous state court decision, this court may consider both decisions to ascertain the reasoning of

24  the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When

25  a federal claim has been presented to a state court and the state court has denied relief, it may be

26  presumed that the state court adjudicated the claim on the merits in the absence of any indication

7

1  or state-law procedural principles to the contrary." *Harrington*, 131 S. Ct. at 784-85.  This

2  presumption may be overcome by a showing that "there is reason to think some other

3  explanation for the state court's decision is more likely."  *Id.* at 785 (citing *Ylst v. Nunnemaker*,

4  501 U.S. 797, 803 (1991)).  Where the state court reaches a decision on the merits but provides

5  no reasoning to support its conclusion, a federal habeas court independently reviews the record

6  to determine whether habeas corpus relief is available under § 2254(d).  *Stanley*, 633 F.3d at

7  860; *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record

8  is not de novo review of the constitutional issue, but rather, the only method by which we can

9  determine whether a silent state court decision is objectively unreasonable."  *Himes*, 336 F.3d at

10  853.  Where no reasoned decision is available, the habeas petitioner still has the burden of

11  "showing there was no reasonable basis for the state court to deny relief."  *Harrington*, 131 S.

12  Ct. at 784.

13      When it is clear, however, that a state court has not reached the merits of a petitioner's

14  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

15  habeas court must review the claim de novo.  *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462

16  F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook,* 333 F.3d 1052, 1056 (9th Cir. 2003).[7]

17  **IV.   Petitioner's Claims**

18      **A. Admissibility of Petitioner's Statements to Police**

19      In petitioner's first ground for relief, she claims that her confession to police was

20  involuntary.[8]  Dckt. 2-1 at 8 (Pet.).  She notes that at the time she was interrogated she was 16

21

22          [7]  The United States Supreme Court has recently granted certiorari in a case apparently to
   consider this issue.  *See Williams v. Cavazos*, 646 F.3d 626, 639-41 (9th Cir. 2011), *cert. granted
23  in part*, ___U.S.___, 132 S. Ct. 1088 (2012).

24          [8]  In the heading to this claim, petitioner also asserts that her statements to police were
   taken "in violation of *Miranda*."  Dckt. 2-1 at 8.  However, as respondent notes, petitioner does
25  not elaborate on a *Miranda* claim in the body of her argument.  Instead, she focuses her entire
   argument on the voluntariness of her confession.  Because of this, respondent "does not address
26  the issue of whether Petitioner entered a knowing, voluntary, and intelligent waiver of her

years old and five months pregnant. *Id.* She argues that "no juvenile at that age has a grasp of

the significance of his or her actions," and states that she herself did not fully understand her

predicament. *Id.* at 10. She notes that during the course of the police interview she appeared to

be in pain, especially prior to the interrogation when she was left alone in the room. *Id.* at 8.

Petitioner argues that "her pregnancy is a matter that should have been given far more

consideration than has been afforded to it by the courts thus far." *Id.* at 11. She notes that, at

one point, she had to take a walk in the hallway in order to alleviate her discomfort. *Id.* at 8.

She points out that during the interview she asked for a nurse "but was offered no medical

attention." *Id.* at 11. Petitioner also notes that she told the interrogating officer she usually

experienced pain when she was "stressed out." *Id.* She argues that "pregnant women have

intense hormonal fluctuations that may distort their interpretation of their situation." *Id.* at 12.

Petitioner also notes that she asked the detective several times whether he had talked to

her mother, and at one point asked whether she was going to talk to her mother. *Id.* at 8-9. She

argues that the officer's responses to these questions were "designed to allay Ms. Lewis'

concerns and preclude her from directly asking to speak to her mother." *Id.* at 9. Petitioner also

argues that the officer failed to tell her mother that she was being interrogated for murder and

that, if her mother had been told this, she "likely would have immediately sought the assistance

of an attorney." *Id.* at 13.

Petitioner states that she had "virtually" no experience dealing with law enforcement or

the criminal justice system, that she was "desperate and confused," and that she "did not evince

any of the character traits of a mastermind or otherwise highly developed intellectual or

---

*Miranda* rights because the issue has not been properly raised here." Dckt. No. 19 at 19 fn 5.
Petitioner's traverse does not contain a response to this statement by the respondent. Indeed, the
traverse does not contain any argument at all on her claim challenging the admission of her
statements to police. Under these circumstances, this court will assume that petitioner is not
challenging her confession to the police on *Miranda* grounds. Even if she were, any such
challenge would not be meritorious. For the reasons stated by the California Court of Appeal,
the record reflects that petitioner validly waived her constitutional rights before speaking to the
police.

emotional abilities." *Id.* at 10.  Petitioner also notes that in the secretly recorded conversation between herself and codefendant Ramsey after their joint interrogation, it is clear that she did not understand the gravity of her situation.  *Id.*  She states that the detective did not inform her of the seriousness of the consequences she faced, nor did he tell her that her interrogation involved a murder.  Instead, he led her to believe that he was concerned about her truancy and the use of stolen credit cards.  *Id.* at 10-11.  Petitioner notes that it was not until the end of the interview that the detective informed her she had been arrested because of the murder.  Petitioner argues that "the officer's decision not to immediately inform Ms. Lewis of the reason for her arrest also permitted him to elicit contradictory responses that were later used to impeach her at trial."  *Id.* at 11.  She asserts that "this sort of underhanded technique may be understandable when dealing with an adult, but not a child."  *Id.*

Petitioner states that she and co-defendant Ramsey both believed that Ramsey was solely responsible for the murder.  *Id.*  She explains that her answers to the police interrogator were designed to "mitigate the harm that could befall Mr. Ramsey."  *Id.*  She further explains that she was a troubled child who had run away from home, experimented with drugs, and suffered from depression.  *Id.* at 12.  She states that the victim "had taken advantage of her vulnerability to obtain sexual favors from her."  *Id.*

Finally, petitioner argues that her initial coerced police interrogation "directly precipitated the subsequent statements that she made when she was left alone in the room with Mr. Ramsey and when both defendants were taken by police to the crime scene."  *Id.*  She states that all of her statements to police should be suppressed as "fruit of the poisonous tree."  *Id.*

### 1. Decision of the California Court of Appeal

The California Court of Appeal rejected all of these arguments, reasoning as follows:

> Defendant contends the "[t]he totality of circumstances demonstrate that [she] did not voluntarily waive her *Miranda* rights" and that she did not voluntarily confess to police.  She bases these contentions on similar arguments: she invoked her privilege against self-incrimination by asking to speak with her

mother; she was young, pregnant, in pain, and naive; the detective's introductory comments "softened" the impact of the *Miranda* advisements; and the detective's lie that Ramsey had called her the mastermind of the crimes suggested "coercion." As we explain, we agree with the trial court the statements were properly admitted.

The determination of whether a *Miranda* waiver and a confession by a juvenile defendant was voluntary, knowing, and intelligent is based on the totality of circumstances. (*Fare v. Michael C.* (1979) 442 U.S. 707, 724-725 [61 L.Ed.2d 197, 212]; *see People v. Neal* (2003) 31 Cal.4th 63, 79, 84.) Here, the totality of circumstances demonstrates a voluntary, knowing, and intelligent waiver of *Miranda* and confession by defendant.

In the initial interrogation of defendant by Detective Lange, the detective admonished defendant of her *Miranda* rights. After reciting each right, he asked defendant if she understood the right, and she acknowledged either by words or by nodding that she did. There was nothing in the detective's introductory comments that would trick defendant into believing the reading of the rights was a mere technicality, that she was not required to respond, or that she was not allowed to exercise her rights.

Although defendant did not expressly waive her rights, her subsequent statements demonstrate an implied waiver. (*People v. Cruz* (2008) 44 Cal.4th 636, 667-668.) At the interview, defendant appeared intelligent and her answers were clear and responsive. Her youth and pregnancy did not impair her judgment. She did not request to see or speak to her mother. Instead, she asked whether she was going to talk to her mother at some point. This did not amount to an invocation of her rights. (*See People v. Hector* (2000) 83 Cal.App.4th 228, 237 [minor's request to speak to her parents is an indication the minor wishes to invoke her *Miranda* right].)

Defendant responded voluntarily to the detective's questions and confessed on her own. Nothing in the interview suggests the detective used any "physical or psychological pressure" to obtain defendant's statements; she "was not worn down by improper interrogation tactics, lengthy questioning, or trickery or deceit" nor were there any improper promises. (*People v. Whitson* (1998) 17 Cal.4th 229, 248-249.) While the officer did lie to defendant with the mastermind comment, the use of deception by law enforcement is permissible when it is not likely to produce an untrue statement. (*People v. Farnam* (2002) 28 Cal.4th 107, 182-183.) There was nothing in the statement that would have induced defendant to confess absent her own free will.

Indeed, the portrait that emerged of defendant from the interrogation was of a criminally-sophisticated, intelligent

> 16-year-old who understood what the detective was telling her, who decided on her own she wanted to waive her *Miranda* rights and confess after being caught in one lie after another.
>
> The trial court did not err in concluding defendant knowingly, intelligently, and voluntarily waived her rights under *Miranda* and confessed to police. The trial court therefore ruled correctly that defendant's statements during the initial interview and in subsequent interviews were admissible.

Dckt. 19-1 at 5-8.

### 2. Applicable Legal Standards

The Fourteenth Amendment to the United States Constitution demands that confessions be made voluntarily. *See Lego v. Twomey*, 404 U.S. 477, 483-85 (1972). In determining whether a confession is voluntary, "the question is 'whether the defendant's will was overborne at the time he confessed.'" *Haynes v. Washington*, 373 U.S. 503, 513 (1963); *see also Amaya-Ruiz v. Stewart*, 121 F.3d 486, 494 (9th Cir. 1997) (the test is "whether . . . the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne."). "The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession." *Collazo v. Estelle*, 940 F.2d 411, 416 (9th Cir. 1991) (en banc) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)); *see also Pollard v Galaza*, 290 F.3d 1030, 1033 (9th Cir. 2002) ("Under the Fourteenth Amendment, a confession is involuntary only if the police use coercive means to undermine the suspect's ability to exercise his free will."); *Henry v. Kernan*, 197 F.3d 1021, 1027 (9th Cir. 1999). In the end, a reviewing court must ask: "Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *Doody v. Ryan*, 649 F.3d 986, 1008 (9th Cir. 2011) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26 (1973)).

////

"There is no 'talismanic definition of 'voluntariness'' that is 'mechanically applicable.'" *Clark v. Murphy*, 331 F.3d 1062, 1072 (9th Cir. 2003), *overruled in part on other grounds* by *Lockyer v. Andrade*, 538 U.S. 63 (2003) (quoting *Schneckloth*, 412 U.S. at 224).  Rather, voluntariness is to be determined in light of the totality of the circumstances.  *See Miller v. Fenton*, 474 U.S. 104, 112 (1985).  This includes consideration of both the characteristics of the petitioner and the details of the interrogation.  *Schneckloth*, 412 U.S. at 226 (The court must examine "the factual circumstances surrounding the confession, assess [ ] the psychological impact on the accused, and evaluate [ ] the legal significance of how the accused reacted.").  "The factors to be considered include the degree of police coercion; the length, location and continuity of the interrogation; and the defendant's maturity, education, physical condition, mental health, and age."  *Brown v. Horell*, 644 F.3d 969, 979 (9th Cir. 2011).  *See also United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003) ("Courts . . . often consider the following factors: the youth of the accused, his intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep.");  *Henry*, 197 F.3d at 1026 ("[v]oluntariness depends on such factors as the surrounding circumstances and the combined effect of the entire course of the officers' conduct upon the defendant").  The totality-of-the-circumstances test to determine voluntariness applies "even where interrogation of juveniles is involved," because "[t]he totality approach ... mandates ... inquiry into all the circumstances surrounding the interrogation," such as "the juvenile's age, experience, education, background, and intelligence . . . ."  *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).

"A confession is involuntary if coerced either by physical intimidation or psychological pressure." *Haswood*, 350 F.3d at 1027; *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981) ("subtle psychological coercion suffices . . . at times more effectively 'to overbear a rational intellect and a free will' ").  Officials cannot extract a confession "by any sort of threats

or violence, nor . . . by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)).  False promises or threats may render a confession invalid.  *See, e.g., Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (confession found to be coerced by officers' false statements that state financial aid for defendant's infant children would be cut off, and her children taken from her, if she did not cooperate); *Rogers v. Richmond*, 365 U.S. 534, 541-45 (1961) (defendant's confession was coerced when it was obtained in response to a police threat to take defendant's wife into custody); *Spano*, 360 U.S. 315, 323 (1959) (confession found to be coerced where police instructed a friend of the accused to falsely state that petitioner's telephone call had gotten him into trouble, that his job was in jeopardy and that loss of his job would be disastrous to his three children, his wife and his unborn child).  However, "misrepresentations made by law enforcement in obtaining a statement, while reprehensible, do[] not necessarily constitute coercive conduct."  *Pollard*, 290 F.3d at 1034.  Additionally, encouraging a suspect to tell the truth is not coercion.  *Amaya-Ruiz*, 121 F.3d at 494.  Nor is it coercive to recite potential penalties or sentences, including the potential penalties for lying to the interviewer.  *Haswood*, 350 F.3d at 1029.

Finally, "[w]arnings and a waiver are not dispositive of a confession's voluntariness." *Doody*, 548 F.3d at 860.  Compliance with *Miranda* does not conclusively establish the voluntariness of a subsequent confession.  *Berkemer v. McCarty*, 468 U.S. 420, 433 n. 20 (1984). "Moreover, when analyzing the voluntariness of a confession following *Miranda* warnings, the delivered warnings, even if sufficient to satisfy *Miranda*'s prophylactic rule, must be examined in detail, as they are part of the circumstances pertinent to the voluntariness inquiry."  *Doody*, 548 F.3d at 860.

Where an involuntary confession is improperly admitted at trial, a reviewing court must apply a harmless error analysis, assessing the error "in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt."  *Arizona v.*

1   *Fulminante*, 499 U.S. 279, 308 (1991).  In the context of habeas review, the standard is whether

2   the error had substantial and injurious effect or influence in determining the jury's verdict.  *See*

3   *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Beatty v. Stewart*, 303 F.3d 975,  994 (9th Cir.

4   2002); *Henry*, 197 F.3d at 1029.  The analysis must be conducted with an awareness that "a

5   confession is like no other evidence," and that "a full confession may have a 'profound impact'

6   on the jury."  *Fulminante*, 499 U.S. at 296.  *See also Henry*, 197 F.3d at 1029-30.

7            **3.  Analysis**

8         This court has reviewed the videotape of petitioner's interrogation and agrees with the

9   California Court of Appeal that petitioner's confession to police was not given involuntarily.

10   There is no evidence petitioner was coerced to confess to a crime she did not commit or that she

11   was intimidated or worn down by improper interrogation tactics, lengthy questioning, or

12   anything else.  On the contrary, petitioner answered the detective's questions fully and freely

13   during an interrogation that was not unduly lengthy and never harsh.  There is also no evidence

14   that petitioner's will was overborne by the overall circumstances or the conduct of the

15   interrogation.  Petitioner was alert and articulate throughout the interrogation, she was offered

16   breaks whenever she appeared to be in pain or upset, and she was given food and water and

17   allowed to walk outside the interview room.  The interrogation was not conducted in an

18   uncomfortable location and petitioner was frequently asked how she felt and whether she needed

19   anything.

20         Although petitioner was pregnant, there is no evidence the pregnancy interfered with her

21   ability to respond to the detective's questions, that it prevented her from paying attention or

22   following during the interview, or that it caused her to falsely confess.  The one occasion in

23   which petitioner appeared to be in pain occurred before the questioning began and was resolved

24   by a short walk in the hallway outside the interview room.  In fact, before the interrogation

25   began, petitioner assured the detective that she was fine and ready to proceed.  Of course,

26   pregnant women are not categorically incapable of being interrogated, and there is no

1  presumption that pregnancy itself results in involuntary statements.  Certainly, that was not the

2  case here.  To the extent petitioner's pregnancy may have caused her to be in some physical

3  discomfort, there is no evidence on the videotape that the discomfort interfered in any substantial

4  way with the questioning.  Nor is there evidence that hormonal changes compromised

5  petitioner's ability to understand what was going on.

6        It is true that petitioner was not advised at the beginning of the interrogation that she was

7  being questioned about a murder, nor did she appear to understand that her involvement in the

8  crime exposed her to the same penal consequences as Ramsey.  However, petitioner has failed to

9  explain how her misapprehension in this regard caused her will to be overborne or rendered her

10  statements involuntary.  Certainly many suspects are mistaken about the extent of the possible

11  consequences of their actions.  In this case, petitioner appeared to be a very intelligent sixteen

12  year-old and there is no evidence she lacked sufficient education or maturity to be able to

13  understand that she was facing serious consequences as a result of what she and Ramsey had

14  done.  In this regard, the interrogating officer's questions centered on her use of the victim's

15  credit cards.  The fact that she knew the victim had also been murdered almost certainly

16  informed her understanding of the possible reasons for her arrest.

17        In addition, petitioner was advised of her constitutional rights prior to the interrogation.

18  She did not appear to be confused as to their meaning and she continued to answer the

19  detective's questions.  Further, although petitioner asked several times whether the detective had

20  spoken with her mother and whether she would be speaking with her mother, she never directly

21  asked to speak with her mother.  A review of the videotape of petitioner's interrogation does not

22  reflect that petitioner was unwilling to talk to the police unless she spoke to her mother first or

23  unless her mother was present.  On the contrary, she told the detective that she did not have a

24  good relationship with her mother.  Petitioner's mother did not ask the detective if she could

25  speak with petitioner and declined to come to the police station to see her.  Reporter's Transcript

26  on Appeal (RT) at 70-71; Clerk's Transcript on Appeal (CT) at 335.  Under these circumstances,

1   this court concludes that the fact petitioner did not talk to her mother is not dispositive of this

2   claim.[9]

3        It is true that the detective told petitioner that Ramsey had implicated her as the

4   mastermind of the crime.  However, petitioner told Ramsey during their recorded conversation

5   that she did not believe this.  Accordingly, while reprehensible, this use of deception does not

6   constitute coercive conduct.  This false statement by the interrogating detective, which petitioner

7   did not believe, would not have caused her will to be overborne.

8        While petitioner may have been afraid or apprehensive about her situation, "a

9   defendant's mental state alone does not make a statement involuntary."  *United States v. Turner*,

10   926 F.2d 883, 888 (9th Cir. 1991) (citing *Colorado v. Connelly*, 479 U.S. 157, 169-71 (1986)).

11   Rather, "[c]oercive conduct by police must have caused [her] to make the statements."  *Id.* at

12   888.  There is no evidence here that coercive conduct by the police caused petitioner to confess.

13   In addition, petitioner had given statements to the police, after being advised of her *Miranda*

14   rights, in a petty theft case within two years prior to her interrogation in this case.  CT at 172,

15   176, 178.  Accordingly, she was not completely unfamiliar with police interrogations.

16        As explained above, a criminal defendant's age is a relevant factor in determining

17   whether a confession or a waiver of a constitutional right was voluntary.  *See Doody*, 649 F.3d at

18   1008 ("The fact that Doody was a juvenile is of critical importance in determining the

19   voluntariness of his confession").  *See also Withrow v. Williams*, 507 U.S. 680, 693 (1993)

20

21       [9] California law previously provided that "a minor subject to custodial interrogation
invokes the Fifth Amendment by asking to see a parent."  *Taylor v. Maddox*, 366 F.3d 992, 1002

22   n.6 (9th Cir. 2004) (citing *People v. Burton*, 6 Cal.3d 375, 383–84 (1971)).  *Burton* held that
"upon such a request, before or during questioning, '[t]he police must cease custodial

23   interrogation immediately.'"  *Burton*, 6 Cal.3d at 384.  This rule has recently been abrogated.  In
*People v. Lessie*, 47 Cal.4th 1152, 1167-68 (2010), the California Supreme Court disapproved

24   *Burton*'s holding on this point, holding that a minor's request to speak to a parent is simply one
of the circumstances to be considered in determining the voluntariness of a confession.  *Id.*

25   Under *Lessie*, a minor's statements to an interrogating officer are subject to exclusion only if
"the totality of the relevant circumstances demonstrated that his purpose in asking to speak with

26   his [parent] was to invoke his Fifth Amendment privilege."  *Id.* at 1170.  In any event, here, as
discussed above, petitioner did not ask to speak to her mother during her interrogation.

1    (noting that a defendant's "maturity" is one of the factors used to determine if a defendant's

2    confession was voluntary); *Schneckloth*, 412 U.S. at 226 (stating that determination whether

3    consent to search a car was voluntary is made under the totality of circumstances, including "the

4    youth of the accused"); *In re Gault*, 387 U.S. 1, 45 (1967) ("This court has emphasized that

5    admissions and confessions of juveniles require special caution").  In *Haley v. Ohio*, 332 U.S.

6    596, 599-601 (1948), the United States Supreme Court observed that juvenile defendants are

7    generally more susceptible to police coercion than adults and that due process demands that a

8    defendant's juvenile status be taken into consideration when determining the proper procedural

9    safeguards that attach to a custodial interrogation.  The court ultimately concluded that the

10   murder confession made by the fifteen year old defendant without consultation with counsel or

11   parents "cannot be judged by the more exacting standards of maturity" and that defendant's due

12   process rights had been violated.

13       In *Gallegos v. Colorado*, 370 U.S. 49 (1962), the United States Supreme Court was

14   called upon to review the conviction of a petitioner convicted of the first degree murder of an

15   elderly man which took place in the context of a robbery.  At the time of the offense the

16   petitioner was fourteen years of age.  At trial the prosecution introduced evidence of his

17   confession, which he signed without the benefit of a lawyer, parent or other adult.  In finding that

18   the confession was obtained in violation of the Constitution, the Supreme Court observed:

19           The prosecution says that the boy was advised of his right to
             counsel, but that he did not ask either for a lawyer or for his
20           parents.  But a 14-year-old boy, no matter how sophisticated, is
             unlikely to have any conception of what will confront him when he
21           is made accessible only to the police.  That is to say, we deal with
             a person who is not equal to the police in knowledge and
22           understanding of the consequences of the questions and answers
             being recorded and who is unable to know how to protest his own
23           interests or how to get the benefits of his constitutional rights.

24                                          * * *

25           There is no guide to the decision of cases such as this, except the
             totality of circumstances that bear on the two factors we have
26           mentioned.  The youth of the petitioner, the long detention, the

                                              18

1

> failure to send for his parents, the failure immediately to bring him before the judge of the Juvenile Court, the failure to see to it that he had the advice of a lawyer or a friend – all these combine to make us conclude that the formal confession on which this conviction may have rested (*see Payne v. Arkansas*, 356 U.S. 560, 568, 78 S.Ct. 844, 850, 2 L.Ed.2d 975) was obtained in violation of due process.

370 U.S. at 53.

In *Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004), the U.S. Court of Appeals for the Ninth Circuit concluded that a confession given to police by a sixteen year-old boy was involuntary where his repeated requests to speak to his mother and to his attorney were ignored, there was no evidence the police detectives even attempted to locate defendant's mother, he was taken from his home at gunpoint in the middle of the night and interrogated until 3:00 a.m., and detectives "engaged in hard-ball tactics to get him to confess before he had a chance to seek the advice of any adult as to how he should proceed." *Id.* at 1013-14.  Factors relevant to the court's decision included "[defendant's] relative youth, the time of night when he was questioned, the length of the interrogation, the absence of an attorney or parent, the fact that he 'was given no food, offered no rest break, and may or may not have been given any water,' (citation to state court record omitted), and the denial of his requests to speak with his mother." *Id.* at 1015. Further, the fact that the police detective "threatened [defendant] by jabbing his ring in [defendant's] face and diagramming a grim future if [defendant] did not confess," convinced the court that the defendant's will was overborne. *Id.* at 1016.  In *Doody*, the seventeen year old defendant's confession was deemed involuntary where it involved:

> an extraordinarily lengthy interrogation of a sleep-deprived and unresponsive juvenile under relentless questioning for nearly thirteen hours by a tag team of detectives, without the presence of an attorney, and without the protections of proper *Miranda* warnings.  The intensive and lengthy questioning was compounded by Doody's lack of prior involvement in the criminal justice system, his lack of familiarity with the concept of *Miranda* warnings, and the staging of his questioning in a straight-back chair, without even a table to lean on.

*Doody*, 649 F.3d at 1009.

1    The circumstances of petitioner's interrogation were not nearly as coercive as the

2    circumstances present in *Taylor* or *Doody*. It is true that petitioner's young age at the time of the

3    interrogation is a factor weighing in favor of her argument. However, this factor, standing alone,

4    is insufficient to demonstrate that her confession was involuntary. Petitioner was not sleep

5    deprived, she did not ask to speak to an adult[10] or an attorney, she was not denied food and rest

6    breaks, she was not threatened by the detective, the interrogation was not unduly lengthy, and

7    she had some involvement with the criminal justice system, including the *Miranda* warnings.

8    After weighing all of the relevant circumstances discussed above, this court concludes that

9    petitioner's statements to police were not the product of police coercion which caused her will to

10   be overborne. The decision of the California Court of Appeal rejecting petitioner's claim that

11   her confession was involuntary is not contrary to or an unreasonable application of federal law.

12   Accordingly, petitioner is not entitled to relief on this claim.[11]

13   **B.  Confrontation Clause Error**

14   Citing *Bruton v. United States*, 391 U.S. 123 (1968), petitioner claims that the trial judge

15   violated her rights under the Confrontation Clause when he allowed Lito Ramsey, the brother of

16   Eric Ramsey, to testify about incriminating statements made to him by Eric Ramsey. Pet. at 14.

17   The facts surrounding this claim are the following.

18   Lito Ramsey testified before both juries that he had a conversation with petitioner and

19   Eric Ramsey in the bedroom of his apartment shortly after the murder was committed. RT at

20   183-85. He testified that "they said that they wanted to – that they did rob some guy." *Id.* at

21   185. When he was asked whether they were "both telling you that they robbed this guy," Lito

22

23       [10]  Although she asked whether she was going to talk to her mother at some point, she did
     not ask to speak with her and she told the detective that she did not have a good relationship with
     her mother--a fact supported by the petitioner's mother not asking the detective if she could
24   speak with petitioner and declining to come to the police station to see the petitioner.

25       [11]  In light of the court's conclusion in this regard, petitioner's argument that the
     incriminating statements she made after her initial interrogation should have been excluded as
26   the product of a coerced confession lacks merit.

responded, "One's telling me, the other is agreeing."  *Id.*  He stated that petitioner "brought up"

the subject.  *Id.*  Petitioner stated that "they robbed some guy."  *Id.* at 186.  Lito further testified

that "they" told him they met the victim at a hotel, that Eric Ramsey "knocked him out," and that

"they" robbed him.  *Id.*  He also stated that "they" told him they moved the body of the victim

"to not cause any attention and then they left."  *Id.*  He testified that Eric Ramsey told him he

was "in the bushes waiting," that he "knocked him out from behind," and that "he took the car."

*Id.* at 186-87, 188, 192.   He further testified that "they" told him they had a "plan" to rob the

victim.  *Id.* at 189.  Petitioner told Lito that the victim was flirting with her and that "they felt

like that was a good opportunity to use against him to rob him."  *Id.* at 190.  Eric Ramsey told

Lito that he didn't like the fact the victim was flirting with petitioner.  *Id.* at 191.  Lito also

testified that "they" told him they put the victim's body in the bushes.  *Id.* at 192.  Petitioner told

him that they planned to rob the victim.  *Id.* at 192-93.

Petitioner argues that Lito's testimony violated her right to confront Eric Ramsey, who

did not testify at trial, about the conversation related by Lito.  Pet. at 14-19.  She notes that Lito

did not always clarify who said what, but rather used the word "they" to describe who was

talking.  *Id.* at 16-17.  She argues that this "blurr[ed] the lines between statements made by

[petitioner] and those made by Eric Ramsey."  *Id.* at 17.  Petitioner also argues that the fact she

might have appeared to Lito to be in agreement with the statements being made by Eric Ramsey

does not cure the constitutional violation that resulted from Lito's testimony because she "had a

right to cross examine Eric Ramsey regarding the inculpatory statements he made during this

conversation."  *Id.* at 18.

### 1. State Court Proceedings

As explained above, on February 3, 2011, petitioner filed a petition for writ of habeas

corpus in the Sacramento County Superior Court (case No. 11F00682), in which she raised this

Confrontation Clause claim for the first time.  Resp.'s Lodg. Doc. 9.  The Superior Court

concluded that the habeas petition was an impermissible successive petition, untimely, and raised

1   issues that could and should have been raised on appeal.  Dckt. No. 19-1 at 11-12.  The court

2   reasoned as follows:

3   **1.  This is an impermissible successive petition.**

4   On February 18, 2010, petitioner filed a petition for writ of habeas
    corpus, alleging her conviction should be set aside because the trial
5   court erred in allowing introduction of her videotaped confession.
    (Sacramento County Superior Court case 10F01060.)  That petition
6   was denied April 6, 2010.

7   A successive petition for writ of habeas corpus is an abuse of the
    writ and thus barred absent exceptional circumstances not alleged
8   here.  (*See In re Robbins* (1998) 18 Cal.4th 770, 811-812, 812 fn.
    32; *In re Clark* (1993) 5 Cal.4th 750, 774-775); *People v. Welch*
9   (1993) 5 Cal.4th 228; and *In re Harris* (1993) 5 Cal.4th 813, 842.)

10  Petitioner attempts to avoid the *Robbins/Clark* bar by arguing that
    her name was impermissibly signed on her previous pro per
11  petition by her mother, who was acting on behalf of petitioner
    under power of attorney.  Petitioner argues that in signing her
12  name to her prior pro per petition, her mother was engaged in the
    unauthorized practice of law.  No authority is cited for this
13  proposition.  There is no allegation that petitioner's mother drafted
    the petition, provided legal advice or otherwise engaged in the
14  practice of law.  Rather, petitioner's mother simply signed
    petitioner's name to petitioner's pro per petition pursuant to the
15  mother's power of attorney.

16  Nor is it tenable for petitioner to seek to so abuse the judicial
    process.  Petitioner does not deny that her mother was authorized
17  to sign the pro per petition for her; nor does petitioner assert that
    the prior petition was submitted without her knowledge and
18  approval.  Had the prior petition been granted, would petitioner

19  have disavowed it?  This is an unexcused successive petition.

20  **2.  The petition is untimely**

21  Assuming, arguendo, that petitioner may now disavow her prior
    pro per petition, the instant petition is still untimely.  The
    California Supreme Court affirmed petitioner's conviction on
22  November 19, 2009.  Petitioner's delay in bringing this petition is
    independently subject to the *Robbins.Clark* bar.

23

24  **3.  The petition seeks to raise issues which could and should
    have been addressed on appeal.**

25  Habeas corpus does not serve as a second appeal.  (*In re Waltreus*
26  (1965) 62 Cal.2d 218, 225.)  This rule covers issues that could

1   have been raised on appeal but were not, as well as matters that
    were raised on appeal and decided.  (*In re Harris, supra*, 5 Cal.4th
2   at 829, and *In re Waltreus* at 225.)

3   *Id.*

4          Respondent argues that all of petitioner's claims for relief contained in the habeas

5   petition before this court, with the exception of her claim regarding the voluntariness of her

6   confession, are barred from federal review by the doctrine of procedural default.  Answer at 27-

7   30.  He contends that the Superior Court's reliance on the procedural bars described above to

8   deny her claims precludes this court from considering the merits of petitioner's claims here.  *Id.*

9          Petitioner counters that under the unique circumstances of this case, her claims are not

10  subject to a procedural default.  Traverse at 4-9.  She notes that after the Superior Court issued

11  its decision, she filed a petition for writ of habeas corpus in the California Court of Appeal,

12  raising the same four claims that she raised in her second habeas petition filed in the Superior

13  Court.  Dckt. No. 14-1 at 2-52.  The Court of Appeal summarily denied that petition "on the

14  merits," without issuing an order to show cause.  Dckt. No. 14-2.  Thereafter, after petitioner

15  filed a petition for review in the California Supreme Court, the Supreme Court ordered

16  respondent to file an answer addressing the merits of petitioner's claims.  Resp.'s Lodg. Doc. 17,

17  at 1.  Respondent's answer argued, among other things, that the petition should be denied

18  because it was untimely.  Resp.'s Lodg. Doc. 15 at 4-9.  Citing *Trigueros v. Adams*, 658 F.3d

19  983 (9th Cir. 2011), petitioner argues that the Supreme Court's order for further briefing on the

20  merits signified that the Supreme Court's subsequent denial of her petition is "presumed to be on

21  the merits and represents that Court's implicit rejection of the State's procedural arguments."[12]

22  ─────────────────

23         [12] In *Trigueros*, the California Superior Court denied the petitioner's habeas petition as
    untimely.  After the petitioner filed a habeas petition in the California Supreme Court, the
24  Supreme Court requested and obtained informal briefing on the merits of petitioner's claims.  In
    their responsive briefs, the parties addressed, among other things, whether the petition was
25  timely.  The California Supreme Court subsequently denied the petition without citation or
    explanation.  The Ninth Circuit found that the Supreme Court's unexplained decision effectively
26  overruled the lower court's procedural bar.  The court reasoned that, while the California

1  Traverse at 5.

2       As a general rule, "[a] federal habeas court will not review a claim rejected by a state

3  court 'if the decision of [the state] court rests on a state law ground that is independent of the

4  federal question and adequate to support the judgment." *Walker v. Martin*, 562 U.S.___, ___,

5  131 S. Ct. 1120, 1127 (2011) (quoting *Beard v. Kindler*, 558 U.S. ___, ___, 130 S. Ct. 612, 615

6  (2009). *See also Maples v. Thomas*, ___U.S.___, ___, 132 S. Ct. 912, 922 (2012); *Greenway v.*

7  *Schriro*, 653 F.3d 790, 797 (9th Cir. 2011); *Calderon v. United States District Court (Bean)*, 96

8  F.3d 1126, 1129 (9th Cir. 1996) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).

9  However, a reviewing court need not invariably resolve the question of procedural default prior

10  to ruling on the merits of a claim. *Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997); *see also*

11  *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002): ("Procedural bar issues are not

12  infrequently more complex than the merits issues presented by the appeal, so it may well make

13  sense in some instances to proceed to the merits if the result will be the same"); *Busby v. Dretke*,

14  359 F.3d 708, 720 (5th Cir. 2004) (noting that although the question of procedural default should

15  ordinarily be considered first, a reviewing court need not do so invariably, especially when the

16  issue turns on difficult questions of state law).  Under the circumstances presented here,

17  petitioner's claims can be resolved more easily by addressing them on the merits.  Accordingly,

18  the court assumes that petitioner's claims are not defaulted.

19  ////

20  ////

21  ────────────────

22  Supreme Court had before it all of the untimeliness arguments, it did not cite cases involving the untimeliness procedural bar in denying habeas relief.  The court concluded that these

23  circumstances constituted "compelling factual circumstances . . . signaling that the California Supreme Court did consider and reject the State's timeliness argument." *Trigueros*, 658 F.3d at

24  990.  Here, as in *Trigueros*, the California Supreme Court had before it briefing on the untimeliness issue.  However, when it denied the petition it did not cite any cases on procedural

25  default, as the California Superior Court had done.  Further, here the California Court of Appeal expressly denied petitioner's habeas petition "on the merits."  These circumstances, along with

26  the holding in *Trigueros*, cast doubt on the merit of respondent's contention that review of petitioner's claims is precluded by the doctrine of procedural default.

1    As explained above, in addition to relying on procedural grounds to deny petitioner's

2  habeas petition, the California Superior Court also denied each of petitioner's claims on the

3  merits.  With respect to her Confrontation Clause claim, the Superior Court reasoned as follows:

4  **a) There was no Aranda/Bruton error**

5  Petitioner argues the trial court erred in admitting testimony by her
   codefendant's brother recounting a conversation in which
6  incriminating statements were made by petitioner and/or her
   codefendant.  Petitioner argues this violated *Bruton v. United*
7  *States* (1968) 391 U.S. 123 and *People v. Aranda* (1965) 63 Cal.2d
   518.  (Petitioner also claims ineffective assistance of trial and
8  appellate counsel in failing to raise the claim.)  The claim fails.

9  First, a statement by petitioner's codefendant in a noncustodial
   setting that is against the accomplice's penal interest or that is a
10 spontaneous statement is admissible against petitioner.  (*People v.*
   *Smith* (2005) 135 Cal.App.4th 914, *People v. Cervantes* (2004)
11 118 Cal.App.4th 162, *People v. Greenberger* (1997) 58
   Cal.App.4th 298, *People v. Duke* (1999) 74 Cal.App.4th 23, and
12 *Padilla v. Terhune* (9th Cir. 2002) 309 F.3d 614.)

13 Additionally, the challenged statements were either made directly
   by petitioner, or were made by her codefendant and she assented to
14 them such as to render them adoptive admissions.  The statements
   are thus not subject to *Bruton-Aranda*.  (*People v. Roldan* (2005)
15 35 Cal.4th 646; *People v. Combs* (2004) 34 Cal.4th 821; *People v.*
   *Castille* (2005) 129 Cal.App.4th 863; and *People v. Osuna* (1969)
16 70 Cal.2d 759).[13]

17 Dckt. No. 19-1 at 12-13.

18 **2.  Applicable Legal Standards**

19    The Sixth Amendment to the United States Constitution grants a criminal defendant the

20 right "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  "The 'main and

21 essential purpose of confrontation is to secure for the opponent the opportunity of

22 cross-examination.'"  *Fenenbock v. Director of Corrections for California*, ___ F.3d ___, 2012,

23 No. 11-15880, 2012 WL 3743171, at *5 (9th Cir. Aug. 30, 2012) (quoting *Delaware v. Van*

24

25    [13]  Petitioner also fails to attach a copy of reporter's transcript of the challenged
   testimony, which would itself require denial of the claim (*In re Harris, supra*, 5 Cal.4th at 827,
26 fn. 5).

*Arsdall*, 475 U.S. 673, 678 (1986)).  The Confrontation Clause applies to the states through the Fourteenth Amendment.  *Pointer v. Texas*, 380 U.S. 400, 406 (1965).

In 2004, the United States Supreme Court held that the Confrontation Clause bars the state from introducing into evidence out-of-court statements which are "testimonial" in nature unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable.  *Crawford v. Washington*, 541 U.S. 36 (2004).[14]  The *Crawford* rule applies only to hearsay statements that are "testimonial" and does not bar the admission of non-testimonial hearsay statements.  *Id.* at 42, 51, 68.  *See also Whorton v. Bockting*, 549 U.S. 406, 420 (2007) ("the Confrontation Clause has no application to" an "out-of-court nontestimonial statement.")

Although the *Crawford* court declined to provide a comprehensive definition of the term "testimonial," it stated that "[s]tatements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard."  *Crawford*, 541 U.S. at 52.  The court also provided the following "formulations" of a "core class" of testimonial statements: (1) "ex parte in-court testimony or its functional equivalent – that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;" (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions;" and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  *Id.* at 51-52.  The court in *Crawford* also pointed out that the Sixth Amendment Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."  *Id.* at 59, n.9.  However, "state evidence rules do not trump a defendant's constitutional right to confrontation," and a reviewing court

---

[14]     *Crawford* applies to this case because it was decided prior to petitioner's appeal.  *Winzer v. Hall*, 494 F.3d 1192, 1194 (9th Cir. 2007).

1   "ensures that an out-of-court statement was introduced for a 'legitimate, nonhearsay purpose'

2   before relying on the not-for-its-truth rationale to dismiss the Confrontation Clause's

3   application."  (citation omitted).  *Williams v. Illinois*, ___ U.S. ___, 132 S.Ct. 2221, 2226 (2012).

4           In *Bruton v. United States*, 391 U.S. 123 (1968), the case relied on by petitioner, the

5   Supreme Court held that a defendant is deprived of his Sixth Amendment right of confrontation

6   when a facially incriminating confession of a non-testifying co-defendant is introduced at their

7   joint trial, even if the jury is instructed to consider the confession only against the co-defendant.

8   391 U.S. at 135.  "Under *Bruton* and its progeny 'the admission of a statement made by a

9   non-testifying codefendant violates the Confrontation Clause when that statement facially,

10  expressly, or powerfully implicates the defendant.'"  *United States v. Hernandez-Orellana*, 539

11  F.3d 994, 1001 (9th Cir. 2008) (quoting *United States v. Mitchell*, 502 F.3d 931, 965 (9th Cir.

12  2007)).[15]  However, after the issuance of the *Crawford* decision, "[i]t is . . . necessary to view

13  *Bruton* through the lens of *Crawford*," and "the threshold question in every case is whether the

14  challenged statement is testimonial.  If it is not, the Confrontation Clause 'has no application.'"

15  *United States v. Figueroa-Cartagena*, 612 F.3d 69, 85 (1st Cir. 2010).  Accordingly, the rule set

16  forth in *Bruton*, which is premised on the Confrontation Clause, does not apply to statements

17  which are non-testimonial.  *United States v. Johnson*, 581 F.3d 320, 326 (6th Cir. 2009)

18  ("Because it is premised on the Confrontation Clause, the *Bruton* rule, like the Confrontation

19  Clause itself, does not apply to nontestimonial statements.").  *See also Fernandez v. Adams*, No.

20  CV 08-3544 PSG (JC), 2011 WL 1344520, *19 n.23 (D.C. Cal. Mar. 1, 2011) (petitioner's

21  Confrontation Clause claim "fails to the extent it is intended to be separately predicated upon

22  _____

23          [15]  In *People v. Aranda*, 63 Cal. 2d 518 (1965), the California Supreme Court  held that at
    a joint trial, a co-defendant's extrajudicial statements inculpating another defendant must be
24  excluded, even if the co-defendant testified at trial.  *Aranda* was abrogated in part in 1982 by an
    amendment to the California Constitution.  *See People v. Boyd*, 222 Cal. App. 3d 541, 562
25  (1990) ("Thus, to the extent *Aranda* required exclusion of inculpatory extrajudicial statements of
    co-defendants, even when the co-defendant testified and was available for cross-examination at
26  trial, *Aranda* was abrogated by Proposition 8.").

*Bruton*.").

Further, Confrontation Clause violations are subject to harmless error analysis. *Whelchel v. Washington*, 232 F.3d 1197, 1205-06 (9th Cir. 2000).[16]  "In the context of habeas petitions, the standard of review is whether a given error 'had substantial and injurious effect or influence in determining the jury's verdict.'"  *Christian v. Rhode*, 41 F.3d 461, 468 (9th Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  Factors to be considered when assessing the harmlessness of a Confrontation Clause violation include the importance of the testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony, the extent of cross-examination permitted, and the overall strength of the prosecution's case. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).[17]

### 3. Analysis

With these standards in mind and after a careful review of the record, this court concludes that petitioner's Confrontation Clause claim lacks merit and must be denied.  The court assumes for purposes of its analysis of this claim that petitioner did not adopt the statements made by Eric Ramsey to his brother Lito, and that those statements implicated petitioner in the crimes.  Even making this assumption, however, Lito's statements were not "testimonial" and therefore are not prohibited by the Confrontation Clause.  Eric Ramsey's statements to Lito were not made under circumstances which would lead an objective witness to believe they would be available for later use at a trial.  Nor were they made to a government officer, as was the case in *Crawford*.  Finally, the statements do not fall within the "per se" examples of testimonial evidence offered by the *Crawford* court, all of which involve

---

[16]  The United States Supreme Court has specifically held that *Bruton* error is subject to harmless error analysis. *Lilly*, 527 U.S. at 139-40; *Harrington v. California*, 395 U.S. 250, 253-54 (1969).

[17]  Although *Van Arsdall* involved a direct appeal and not a habeas action, "there is nothing in the opinion or logic of *Van Arsdall* that limits the use of these factors to direct review." *Whelchel*, 232 F.3d at 1206.

1  out-of-court statements elicited by a government officer with a view to prosecution.  Rather, Eric

2  Ramsey made his statements to a family member during a private and personal conversation,

3  with no expectation that his remarks would be used by a prosecutor at a later trial.  Petitioner and

4  Eric Ramsey had not even been contacted by law enforcement when the conversation with Lito

5  Ramsey took place.  Under these circumstances, Ramsey's statements were not testimonial, as

6  that term is defined in *Crawford*.  *See Jensen v. Pliler*, 439 F.3d 1086 (9th Cir. 2006) (statements

7  made by declarant to his attorney were non-testimonial and therefore not barred by the

8  Confrontation Clause); *United States v. Manfre*, 368 F.3d 832, 838 n.1 (8th Cir. 2004)

9  (statements made by declarant to family members were not "testimonial" because they were "not

10 the kind of memorialized, judicial-process-created evidence of which *Crawford* speaks");

11 *Gonzales v. Clark*, No. CV 08-02251-AG (VBK), 2009 WL 3233906, *8 (C.D. Cal. Sept. 30,

12 2009) (petitioner's private statements to his aunt not testimonial in nature).

13      Petitioner argues that in making the statements to Lito Ramsey, she and Eric Ramsay

14 were confessing to the crimes in order to get advice, knowing that they were "likely the targets

15 of investigation."  Traverse at 22.  She argues that, "in doing so, they were bringing Lito into the

16 picture and thereby recasting him as a witness to a pivotal conversation and all three parties to

17 that conversation were, therefore, aware of its evidentiary potential."  *Id.*  Without citation to

18 authority, petitioner contends that, under these circumstances, the statements made by Eric

19 Ramsey to Lito Ramsey were "testimonial."  This court rejects that argument.  There is no

20 evidence in the record that any of the three participants in the conversation were aware that Lito

21 might be a witness at a later trial, or even that petitioner and Eric would be charged with any

22 crime.  Based on the authorities cited above, the statements made by petitioner and Eric Ramsey

23 to Lito Ramsey in this case were not "testimonial."  Accordingly, their admission into evidence

24 at petitioner's trial was not precluded by the Confrontation Clause.

25      Even if the trial court violated petitioner's rights under the Confrontation Clause in

26 admitting the testimony of Lito Ramsey, any error was harmless.  Petitioner told the

interrogating police detectives that she and Eric Ramsey planned to steal the victim's car and

knock him out, and she and Eric Ramsey gave a full description of how the murder occurred.

CT at 374, *et seq*.  Petitioner and Eric Ramsey also went with police detectives to the scene of

the crime and explained exactly what had happened.  *Id.* at 362-70.  In a joint interrogation,

petitioner and Ramsey explained the circumstances of the crime again.  *Id.* at 371-84.  Petitioner

also discussed the details of the crime in a tape-recorded conversation with Eric Ramsey at the

jail, in which she made clear her complicity in the events that transpired.  At trial, petitioner

admitted she and Ramsey planned to steal the victim's car.  RT at 352-53.  Further, the

statements attributed to Eric Ramsey by Lito Ramsey did not specifically implicate petitioner in

the crime.  On the contrary, those statements reflect only that petitioner and Eric Ramsey

planned to rob the victim.  *Id.* at 192-83.  Under these circumstances, the admission into

evidence of Lito Ramsey's testimony would not have had a substantial and injurious effect or

influence on the verdict.

The decision of the California courts denying petitioner's claim under the Confrontation

Clause is not contrary to or an unreasonable application of federal law.  Accordingly, petitioner

is not entitled to relief on this claim.

## C.  Cruel and Unusual Punishment

In her next ground for relief, petitioner claims that her sentence of twenty-five years to

life for felony murder constitutes cruel and unusual punishment.  Pet. at 21.  She argues that this

case presents a "novel situation" because of her young age at the time of the crime, the fact that

she was pregnant, her history of drug addiction, the presentation of evidence indicating that she

did not intend to murder the victim, and the fact that the victim "took advantage of her youth to

obtain sex."  *Id.* at 25; Traverse at 34.

////

////

////

1    She argues:

2         this court must determine that a sentence of 25 years-to-life is
         grossly disproportionate for [a] juvenile offender (pregnant at the
3         time) who had no intent to cause the death of the victim and who
         did not participate whatsoever in the killing of the victim.  Indeed,
4         the specific facts of the present case reveal that the death was
         likely entirely accidental and that Ms. Lewis had objected to even
5         participating in the underlying felony.

6    Pet. at 21.

7         **1.  State Court Proceedings**

8    The California Superior Court rejected these arguments, reasoning as follows:

9         Petitioner claims her sentence of 25-years-to-life constitutes cruel
         and unusual punishment in violation of the Eighth Amendment and
10        *Graham v. Florida* (2010) 176 L.Ed. 2d 825.  (She additionally
         argues trial and appellate counsel were ineffective in failing to
11        raise this claim).

12        Petitioner notes she was 16 years old at the time of the crime.
         However, the Supreme Court in *Graham* held only that a sentence
13        of life **without possibility of parole** constitutes cruel and unusual
         punishment when imposed for a non-homicide committed by a
14        minor under age 18.  *Graham* is inapposite to the facts of this case.
         First, petitioner was convicted of first degree felony-murder, with
15        the special circumstance that the murder occurred during the
         commission of robbery.  Additionally, she was not sentenced to
16        life without possibility of parole.  Indeed, in sentencing petitioner
         to 25-years-to-life under Penal Code section 190.5, the trial court
17        considered petitioner's age and the circumstances of the offense,
         thereby avoiding the failings addressed in *Graham*.
18
         There is no violation of the Eighth Amendment in this case where
19        petitioner and her codefendant planned to rob the victim age 62,
         ran him over with his own car, transported the victim's body in the
20        trunk of his car, disposed of the body in a field, stole the victim's
         car and used his credit cards.[18]
21
22   Dckt. 19-1 at 13.

23   ////

24

---

25        [18]  Petitioner asserts she took no part in the killing, there was no evidence of intent to
     commit murder, the killing was accidental and she objected to participating in the underlying
26   robbery.  These allegations are unsupported by any citation to the record.

## 2.  Applicable Legal Standards

The United States Supreme Court has held that the Eighth Amendment includes a "narrow proportionality principle" that applies to terms of imprisonment.  *See Harmelin v. Michigan*, 501 U.S. 957, 996 (1991) (Kennedy, J., concurring).  *See also Taylor v. Lewis*, 460 F.3d 1093, 1097 (9th Cir. 2006).  However, successful challenges in federal court to the proportionality of particular sentences are "exceedingly rare."  *Solem v. Helm*, 463 U.S. 277, 289-90 (1983).  *See also Ramirez v. Castro*, 365 F.3d 755, 775 (9th Cir. 2004).  "The Eighth Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime."  *Harmelin*, 501 U.S. at 1001 (Kennedy, J., concurring) (citing *Solem v. Helm*).

In *Lockyer v. Andrade*, the United States Supreme Court held that it was not an unreasonable application of clearly established federal law for the California Court of Appeal to affirm a "Three Strikes" sentence of two consecutive 25 year-to-life imprisonment terms for a petty theft with a prior conviction involving theft of $150.00 worth of videotapes.  *Andrade*, 538 U.S. at 75.  In *Ewing v. California*, 538 U.S. 11, 29 (2003), the Supreme Court held that a "Three Strikes" sentence of 25 years-to-life in prison imposed on a grand theft conviction involving the theft of three golf clubs from a pro shop was not grossly disproportionate and did not violate the Eighth Amendment.  And in *Crosby v. Schwartz*, 678 F.3d 784, 791-92 (9th Cir. 2012), the United States Court of Appeals for the Ninth Circuit held that a sentence of 26 years to life under California's Three Strikes Law for defendant's failure to annually update his registration as a sex offender and failure to register within five days of a change of address did not constitute cruel and unusual punishment, in violation of the Eighth Amendment.

In assessing the compliance of a non-capital sentence with the proportionality principle, a reviewing court must consider "objective factors" to the extent possible.  *Solem*, 463 U.S. at 290.  Foremost among these factors are the severity of the penalty imposed and the gravity of the offense.  "Comparisons among offenses can be made in light of, among other things, the harm

1   caused or threatened to the victim or society, the culpability of the offender, and the absolute

2   magnitude of the crime." *Taylor*, 460 F.3d at 1098.[19]

3   **3. Analysis**

4       This court finds that petitioner's sentence does not fall within the type of "exceedingly

5   rare" circumstance that would support a finding that her sentence violates the Eighth

6   Amendment.  Petitioner's sentence of twenty-five years to life is certainly a significant penalty.

7   However, petitioner and her co-defendant were convicted of the very serious crime of first

8   degree felony murder.  In *Harmelin*, the petitioner received a sentence of life *without the*

9   *possibility of parole* for possessing 672 grams of cocaine.  In light of the *Harmelin* decision, as

10  well as the decisions in *Andrade* and *Ewing*, which imposed sentences of twenty-five years to

11  life for petty theft convictions, and *Crosby*, which imposed a sentence of twenty-six years to life

12  for failing to register as a sex offender, the sentence imposed on petitioner is not grossly

13  disproportionate.  Because petitioner does not raise an inference of gross disproportionality, this

14  court need not compare petitioner's sentence to the sentences of other defendants in other

15  jurisdictions.  This is not a case where "a threshold comparison of the crime committed and the

16  sentence imposed leads to an inference of gross disproportionality."  *Solem*, 463 U.S. at 1004-05.

17  ////

18

19      [19] As noted in *Taylor*, the United States Supreme Court has also suggested that reviewing courts compare the sentences imposed on other criminals in the same jurisdiction, and also compare the sentences imposed for commission of the same crime in other jurisdictions.  460

20  F.3d at 1098 n.7.  However,

21          consideration of comparative factors may be unnecessary; the *Solem* Court "did not announce a rigid three-part test."  *See Harmelin*, 501 U.S. at 1004, 111 S.Ct.

22          2680 (Kennedy, J., concurring).  Rather, "intrajurisdictional and interjurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the

23          crime committed and the sentence imposed leads to an inference of gross disproportionality."  *Id.* at 1004-05, 111 S.Ct. 2680; see also *Rummel v. Estelle*,

24          445 U.S. 263, 282, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980) ("Absent a constitutionally imposed uniformity inimical to traditional notions of federalism,

25          some State will always bear the distinction of treating particular offenders more severely than any other State.").

26  *Id.*

33

1    The court recognizes that the United States Supreme Court has issued several opinions on

2    the subject of lengthy sentences imposed on juvenile defendants.  In *Thompson v. Oklahoma*,

3    487 U.S. 815, 823 (1988), the Supreme Court held that the Eighth and Fourteenth Amendments

4    prohibited the execution of a fifteen year-old defendant convicted of first degree murder.  In

5    *Roper v. Simmons*, 543 U.S. 551 (2005), the Supreme Court held that the Eighth and Fourteenth

6    Amendments prohibited the execution of defendants under the age of eighteen.  In *Graham v.*

7    *Florida*, ___ U.S. ___, 130 S.Ct. 2011 (2010), the Supreme Court held that the Eighth

8    Amendment prohibits the imposition of a sentence of life without parole on a juvenile offender

9    who did not commit homicide.  And in *Miller v. Alabama*, ___ U.S. ___, 132 S.Ct. 2455 (2012),

10   the Supreme Court held that a mandatory sentence of life without the possibility of parole for

11   those under the age of 18 at the time of their crimes violates the Eighth Amendment's

12   prohibition on cruel and unusual punishment.  Here, however, petitioner was sentenced to life

13   *with* the possibility of parole.  That sentence is inarguably harsh, but it allows for the

14   "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."

15   *Graham*, 130 S.Ct. at 2030.  This fact distinguishes the instant case from the cases cited above.

16   The court also notes that petitioner was sentenced pursuant to a California statute that

17   provides that a defendant who is found guilty of first degree special circumstance murder, as

18   petitioner was, "shall" be sentenced to life without parole or, at the discretion of the court, 25

19   years to life.  Cal. Penal Code § 190.5; RT at 751; Pet. at 39 n.4; CT at 687.  The judge who

20   sentenced petitioner noted that "those who are 16 or 17 years old who commit murder with

21   special circumstances must be sentenced to life without possibility of parole unless the Court

22   finds good reason and exercises its discretion to impose the less severe sentence of 25 years to

23   life.  The sentence of life without possibility of parole is thus the presumptive punishment unless

24   the Court finds good cause."  RT at 751.  The judge found mitigating circumstances and

25   exercised his discretion to sentence petitioner to twenty-five years to life rather than the

26   presumptive sentence of life without the possibility of parole.  *Id.*  He took into consideration

1   that petitioner:

2           was five months pregnant at the time of the crime with a history of
            emotional problems.  Miss Lewis was not the actual killer.  And if
3           sentenced to life without possibility of parole, she would serve a
            longer term than the actual killer.  The defendant had a minor prior
4           criminal record as a juvenile.  And, finally, the victim was, to some
            degree, a participant in the events that led up to his death.
5

6   *Id.* at 755.  On the other hand, the judge noted that the trial evidence showed petitioner planned

7   the robbery; that she took advantage of the victim's confidence in her; and that she lied

8   "repeatedly to virtually everyone involved," including Eric Ramsey, her mother, her aunt, the

9   victim, and the police.  *Id.* at 754.

10          The judge ultimately concluded that life with the possibility of parole was the appropriate

11  sentence under the circumstances of this case.  He explained:

12          In the fullness of time, if the defendant matures, is productive and
            discipline free in prison, takes advantage of the programs offered,
13          sometime 25 years or more from now the parole board may
            conclude that she is then suitable for parole.  If so, the board's
14          decision will be subject to review and reversal at that time by
            whoever is governor.
15
            This Court is by no means recommending the defendant be granted
16          parole when she becomes eligible or even predicting some day she
            will be suitable for parole.  Rather, the Court is simply unwilling to
17          hold today that she will never ever possibly be suitable for parole.

18  *Id.* at 756.

19          In order to prevail on her Eighth Amendment claim, petitioner must demonstrate that the

20  state court decisions rejecting the claim constitute an objectively unreasonable application of

21  federal law.  Petitioner is unable to do this under the facts of this case.  Even though petitioner

22  was a juvenile at the time she committed her crimes, the decision of the state courts that the

23  Eighth Amendment did not prohibit a sentence of twenty-five years to life for first degree murder

24  is not contrary to or an unreasonable application of the United States Supreme Court cases cited

25  above.  Accordingly, petitioner is not entitled to relief on this claim.

26  ////

### D. Ineffective Assistance of Counsel

Petitioner claims that her trial and appellate counsel rendered ineffective assistance through several errors of counsel. After setting forth the applicable legal principles, the court will address these claims below.

### 1. Legal Standards

To support a claim of ineffective assistance of counsel, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. *Id*. at 690; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Richter*, 131 S.Ct. at 787-88. (quoting *Strickland*, 466 U.S. at 687). Surmounting the bar imposed by *Strickland* was "never an easy task," and "establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.* at 788.

Second, a petitioner must establish that he was prejudiced by counsel's deficient performance. *Strickland*, 466 U.S. at 693-94. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S.Ct. at 792.

The *Strickland* standards apply to appellate counsel as well as trial counsel. *Smith v. Murray*, 477 U.S. 527, 535-36 (1986); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989). However, an indigent defendant "does not have a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of

professional judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983).  Counsel "must be allowed to decide what issues are to be pressed."  *Id.*  Otherwise, the ability of counsel to present the client's case in accord with counsel's professional evaluation would be "seriously undermined."  *Id.  See also Smith v. Stewart*, 140 F.3d 1263, 1274 n.4 (9th Cir. 1998) (Counsel is not required to file "kitchen-sink briefs" because it "is not necessary, and is not even particularly good appellate advocacy.")  There is, of course, no obligation to raise meritless arguments on a client's behalf.  *See Strickland*, 466 U.S. at 687-88 (requiring a showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing to raise a weak issue.  *See Miller*, 882 F.2d at 1434.  In order to establish prejudice in this context, petitioner must demonstrate that, but for counsel's errors, he probably would have prevailed on appeal.  *Id.* at 1434 n.9.

### 2.  Trial Counsel

#### a.  Logical Connection between the Homicide and the Robbery

Petitioner raises several claims concerning trial counsel's failure to focus the jury's attention on the lack of a connection between the homicide and the underlying robbery with respect to petitioner's involvement in the crimes.  She contends that Eric Ramsey was acting on his own "private animus" when he attacked the victim, and that she had no knowledge or intent that this would occur.  Pet. at 31-32.  She states that Eric Ramsey was "the driving force behind this entire ordeal" and that she was "unable to avoid the tragedy that occurred."  *Id.* at 32.  She argues that the failure to make this point to the jury violated the state court ruling in *People v. Cavitt*, 33 Cal.4th 187 (2004).  *Id.* at 29-35.  She also argues that her trial counsel should have requested a "clarifying instruction" that "would have provided additional guidance to the jury with respect to the logical nexus between the alleged robbery and the death of Mr. Raimer."  *Id.* at 32.

Petitioner also faults trial counsel's failure to "draw the jury's attention to this element of the offense during her closing argument."  *Id.*  She claims that counsel's closing argument was

"unfocused and, at times, thoroughly perplexing." *Id.* Petitioner acknowledges that the jury was instructed on felony murder, and was advised that there must be a logical connection between the act causing the death and the robbery which must involve "more than just their occurrence at the same time and place." *Id.* at 33. However, she contends that "without any reinforcement by [trial counsel], the jury was not likely to be able to understand or apply that instruction to the facts of the case." *Id.* Petitioner suggests that trial counsel could have requested a supplemental jury instruction derived from language contained in the *Cavitt* decision. *Id.* at 34-35. In the traverse, petitioner argues that her trial counsel rendered ineffective assistance in: (1) failing to raise the issue of "whether or not there was a logical connection between the homicide and the underlying crime in their opening statement and closing argument;" (2) failing to call witnesses to demonstrate "that there was no logical connection between the homicide and the underlying crime;" (3) failing to request an instruction "calling attention to and clarifying the logical connection element;" (4) failing to "focus direct and cross examination on this issue;" and (5) failing to "raise this issue and the corresponding ineffectiveness of trial counsel on appeal." Traverse at 40.

The California Superior Court rejected petitioner's claim regarding trial counsel's failure to request a clarifying instruction. The court reasoned as follows:

> **c) Trial counsel was not ineffective in failing to request a clarifying instruction.**
>
> Petitioner argues trial counsel was ineffective in failing to request a clarifying jury instruction regarding the requirement of a logical nexus between the robbery and the death of the victim, for purposes of felony murder. Trial counsel was not ineffective.
>
> Petitioner admits the jury was instructed there must be a logical connection between the act causing the death and the robbery, and that the connection must involve more than just their occurrence at the same time and place. (CALCRIM 540B). She nevertheless asserts that trial counsel should have requested a clarifying instruction based on *People v. Cavitt* (2004) 33 Cal.4th 187: That there be a logical nexus "between the homicidal act and the underlying felony the non-killer committed or attempted to commit." Petitioner argues trial counsel alternatively could have

38

1     requested that the court provide an example relied on in *Cavitt*, in
      which the non-killer watched while the killer shot his lifelong
2     enemy through the window during the course of a burglary.

3     The trial court properly instructed the jury based on CALCRIM
      540B, addressing when a co-participant allegedly committed [a]
4     fatal act.  The jury was instructed that when another person did the
      act resulting in the death and petitioner committed or aided and
5     abetted the underlying robbery, there must be a logical connection
      between the act causing the death and the robbery: The connection
6     between the fatal act and the robbery must involve more than just
      their occurrence at the same time and place.  The instruction given
7     was thus sufficient to convey the requirement that there be a
      logical nexus between the act causing death and the underlying
8     felony, as discussed in *Cavitt*.

9     Petitioner's claim of ineffective assistance of counsel fails.  It is
      not reasonably probable that the court would have given any
10    additional instruction had trial counsel requested.  Nor is it
      reasonably probable that the outcome would have been different
11    had such instruction been given.  As such, the claim of ineffective
      assistance of counsel fails.  (*Strickland v. Washington* (1984) 466
12    U.S. 668.)

13    Dckt. No. 19-1 at 13-14.

14          Petitioner has failed to demonstrate that the Superior Court's decision rejecting this claim

15    of ineffective assistance of counsel was contrary to or an unreasonable application of *Strickland*

16    and *Richter*.  As noted by the state court, petitioner's jury was correctly instructed on the

17    requirement of a logical nexus between the robbery and the death of the victim in order to find

18    petitioner guilty of felony murder.  This court must presume that jurors follow a trial court's

19    instructions, and there is no evidence that petitioner's jurors failed to do so here.  *Francis v.*

20    *Franklin*, 471 U.S. 307, 324 n.9 (1985); *Tak Sun Tan v. Runnels*, 413 F.3d 1101, 1115 (9th Cir.

21    2005).  There is no reasonable probability that the outcome of petitioner's trial would have been

22    different if trial counsel had requested an unspecified clarifying instruction.  The decision of the

23    California Superior Court that the jury instruction on felony murder given at petitioner's trial did

24    not violate the decision in *Cavitt* may not be challenged in this federal habeas proceeding.  This

25    Court is bound by the state court's interpretation of state law.  *Waddington v. Sarausad*, 555 U.S.

26    179, 129 S.Ct. 823, 832 n.5 (2009) ("we have repeatedly held that 'it is not the province of a

federal habeas court to reexamine state-court determinations on state-law questions"); *Rivera v. Illinois*, 556 U.S. 148, 158 (2009) ("[A] mere error of state law . . . is not a denial of due process") (quoting *Engle v. Isaac*, 456 U.S. 107, 121, n. 21 (1982) and *Estelle v. McGuire*, 502 U.S. 62, 67, 72-73 (1991)); *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) "a state court's interpretation of state law . . . binds a federal court sitting in federal habeas"); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (federal habeas corpus relief does not lie for errors of state law).

Petitioner has also failed to demonstrate that her trial counsel rendered ineffective assistance in failing to address the lack of a connection between her intent and the resulting homicide in her closing or opening argument, in failing to address this issue during direct and cross-examination of witnesses, or in failing to call witnesses to demonstrate that there was no "logical connection" between the robbery and the homicide.  Petitioner's conclusory allegations that further investigation into possible witnesses, or further argument or cross-examination, would have resulted in a different verdict are clearly insufficient to establish either deficient performance or prejudice.  *See Jones v. Gomez*, 66 F.3d 199, 204 (9th Cir. 1995) ("'[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief'") (quoting *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994)).  Simply speculating, or stating, that further argument and/or investigation would have led to a different verdict does not establish prejudice.

Further, although petitioner complains that her trial counsel failed to call witnesses to establish a lack of connection between the robbery and the homicide, petitioner has not identified any witnesses who would have testified in her favor or presented any evidence as to what any witness would have testified to which would have aided the defense.  *See Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001) (petitioner failed to establish prejudice where he did "nothing more than speculate that, if interviewed," the witness would have given helpful information); *United States v. Harden*, 846 F.2d 1229, 1231-32 (9th Cir. 1988) (no ineffective assistance because of counsel's failure to call a witness where, among other things, there was no evidence

in the record that the witness would testify); *United States v. Berry*, 814 F.2d 1406, 1409 (9th Cir. 1987) (appellant failed to meet prejudice prong of ineffectiveness claim because he offered no indication of what potential witnesses would have testified to or how their testimony might have changed the outcome of the hearing).  Without direct evidence that specific witnesses would have testified in a manner that might have led to a different result at trial, petitioner's allegations are insufficient to support her claims in this regard.  The court also notes that petitioner testified at trial that she did not know about Eric Ramsey's plan to assault the victim. The jury apparently did not believe her testimony.

Petitioner has failed to demonstrate either deficient performance or prejudice with respect to this claim of ineffective assistance of counsel.  Accordingly, she is not entitled to habeas relief.

### b. Failure to Object to Testimony of Lito Ramsay on Sixth Amendment Grounds

Petitioner also claims that her trial counsel rendered ineffective assistance in failing to object to the trial testimony of Lito Ramsey on Sixth Amendment grounds.  Pet. at 35-36.  She argues that counsel "placed the entire weight of Ms. Lewis' life upon the success of that *Miranda* issue, and once it was decided against Ms. Lewis, [counsel] made no other major evidentiary challenges." *Id.* at 36.  She argues that Lito's testimony constituted a major part of the evidence against her, and contends that had counsel "made appropriate objections, the evidentiary terrain of the trial would have been markedly different." *Id.*

Petitioner is unable to establish prejudice with respect to this claim.  For the reasons set forth above, Lito's testimony did not violate petitioner's rights under the Confrontation Clause. Accordingly, an objection to Lito Ramsey's testimony based on the Sixth Amendment would have been futile. *See Miller*, 882 F.2d at 1434 (noting that if a petitioner challenges a futile objection, he fails both *Strickland* prongs).

////

### c. **Failure to Call Child Psychologist**

In the traverse, petitioner claims that her trial counsel rendered ineffective assistance by failing to call an expert witness in child psychology at the sentencing proceedings to testify to the impact her age, mental health, history of drug abuse, and history of sexual abuse had on her personal culpability for the crimes.  Traverse at 34-39.  She also asserts that "had a psychiatrist or psychologist testified on Ms. Lewis' behalf, there would have been a significant chance that the jury may have understood, and been more sympathetic towards Mr. Lewis' situation thereby resulting in a different verdict."  *Id.* at 34.  She suggests various areas that trial counsel "could and should have explored via expert testimony and/or psychological testimony."  *Id.* at 35.  She argues that her case "represents what is perhaps the least culpable defendant convicted of felony murder in the case law."  *Id.* at 39.

This claim is not contained in the petition filed with this court.  Of course, a traverse is not the proper pleading in which to raise additional grounds for relief.  *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994); *see also Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994) ("we review only issues which are argued specifically and distinctly in a party's opening brief").  Even if the claim had been properly raised, it lacks merit.  Petitioner fails to explain what additional testimony a child psychiatrist would have given that would have changed the outcome of the trial.  Accordingly, she has not demonstrated the second prong of the *Strickland* analysis.  *Matylinsky v. Budge*  577 F.3d 1083, 1097 (9th Cir. 2009) (petitioner failed to demonstrate prejudice where he failed to show "what additional testimony his suggested forty-one witnesses would give in order to change the outcome of the trial); *Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (speculating as to what expert witness would say is not enough to establish prejudice); *Dows v. Wood*, 211 F.3d 480, 486-87 (2000) (no ineffective assistance of counsel for failure to call witnesses where petitioner did not identify an actual witness, provide evidence that the witness would testify, or present an affidavit from the alleged witness).  Accordingly, she is not entitled to relief on this claim.

### 3.  Appellate Counsel

Petitioner claims that her appellate counsel rendered ineffective assistance in failing to raise on appeal the claims contained in the instant petition, and particularly her claims that Lito Ramsey's testimony violated the Confrontation Clause and that her sentence constitutes cruel and unusual punishment.  Petitioner argues that, while the *Miranda* claim raised by appellate counsel was meritorious, appellate counsel "disregarded several vital issues that would probably have resulted in reversal."  Pet. at 36.  She also contends that appellate counsel did not obtain relevant trial records in order to identify additional appellate issues, and was generally unprepared.  *Id.* at 36-37.

This court has concluded that the claims for relief contained in the instant petition are not meritorious.  For the reasons described above, petitioner cannot demonstrate that she probably would have prevailed if her appellate counsel had raised these claims on appeal.  *See Jones v. Ryan*, No. 10-99006, ___ F.3d ___, 2012 WL 3517610, *6 (9th Cir. Aug. 16, 2012) ("It should be obvious that the failure of an attorney to raise a meritless claim is not prejudicial"); *Rhoades v. Henry*, 638 F.3d 1027, 1036 (9th Cir. 2011) (no prejudice from trial counsel's failure to investigate or raise two claims on appeal where "neither would have gone anywhere").  Appellate counsel's decision not to include these claims in petitioner's direct appeal in state court, but instead to focus on a claim that counsel believed was more meritorious, was "within the range of competence demanded of attorneys in criminal cases."  *McMann v. Richardson*, 397 U.S. 759, 771 (1970).  Accordingly, petitioner is not entitled to relief on her claim that her appellate counsel rendered ineffective assistance.

### E.  Cumulative Error

Petitioner claims that she was denied due process as a result of the cumulative impact of the errors at her trial, including those of trial and appellate counsel.  Pet. at 39-40.

////

////

43

1    She makes the following argument:

2         Being convicted on the basis of improper testimony describing
          incriminating statements made by a non-testifying co-defendant,
3         being assisted by an attorney who filed virtually no pretrial
          motions and objected to virtually none of the evidence that was
4         admitted, receiving a disproportionate punishment, and having an
          appellate attorney who simply regurgitated a single failed trial
5         argument amounted to a gross series of injustices for Mr. Lewis.
          Each of these violations, viewed independently, was such that it
6         undermined the verdict in this case.

7   *Id.* at 40.

8         The Ninth Circuit has concluded that under clearly established United States Supreme

9   Court precedent, the combined effect of multiple trial errors may give rise to a due process

10  violation if it renders a trial fundamentally unfair, even where each error considered individually

11  would not require reversal.  *Parle v. Runnels*, 505 F.3d 922, 927 (9th. Cir. 2007) (citing

12  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) and *Chambers v. Mississippi*, 410 U.S.

13  284, 290 (1973)).  *See also Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) (if no error of

14  constitutional magnitude occurred at trial, "no cumulative prejudice is possible").  "The

15  fundamental question in determining whether the combined effect of trial errors violated a

16  defendant's due process rights is whether the errors rendered the criminal defense 'far less

17  persuasive,' *Chambers*, 410 U.S. at 294, and thereby had a 'substantial and injurious effect or

18  influence' on the jury's verdict."  *Parle*, 505 F.3d at 927 (quoting *Brecht*, 507 U.S. at 637).

19        This court has addressed each of petitioner's claims raised in the instant petition and has

20  concluded that no error of constitutional magnitude occurred at her trial in state court.  This court

21  also concludes that the alleged errors, even when considered together, did not render petitioner's

22  defense "far less persuasive," nor did they have a "substantial and injurious effect or influence

23  on the jury's verdict."  Accordingly, petitioner is not entitled to relief on her claim of cumulative

24  error.

25  ////

26  ////

## V.      Request for Evidentiary Hearing

Petitioner requests an evidentiary hearing on the following issues: "whether trial and appellate counsel were ineffective, whether the trial court erred in denying Ms. Lewis' *Miranda* motion, the effect that calling a child psychologist would have had on the trial, and the specifics of who was speaking during the crucial conversation between Candice Lewis, Eric Ramsay, and Lito Ramsay."   Traverse at 43.  She requests a hearing at which she would call "Ms. Lewis' trial and appellate attorneys, Mr. Lito Ramsey, Mr. Eric Ramsey, a child psychology expert, Ms. Candice Lewis, and any other witnesses necessary to the resolution of these claims." *Id.*

Pursuant to 28 U.S.C. § 2254(e)(2), an evidentiary hearing is appropriate under the following circumstances:

> (e)(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that-
>
> (A) the claim relies on-
>
> (I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense;

28 U.S.C. § 2254(e)(2).

Under this statutory scheme, a district court presented with a request for an evidentiary hearing must first determine whether a factual basis exists in the record to support a petitioner's claims and, if not, whether an evidentiary hearing "might be appropriate." *Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th Cir. 1999).  *See also Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005); *Insyxiengmay v. Morgan*, 403 F.3d 657, 669-70 (9th Cir. 2005).  A federal court must take into account the AEDPA standards in deciding whether an evidentiary hearing is

1    appropriate.  *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).  A petitioner must also "allege[]

2    facts that, if proved, would entitle him to relief."  *Schell v. Witek*, 218 F.3d 1017, 1028 (9th Cir.

3    2000).  In addition, the Supreme Court has recently held that federal habeas review under 28

4    U.S.C. §  2254(d)(1) "is limited to the record that was before the state court that adjudicated the

5    claim on the merits" and "that evidence introduced in federal court has no bearing on" such

6    review.  *Cullen v. Pinholster*, 563 U.S. ___, ___, 131 S. Ct. 1388, 1398, 1400 (2011).

7            The court concludes that no additional factual supplementation is necessary and that an

8    evidentiary hearing is not appropriate with respect to the claims raised in the instant petition.  In

9    addition, for the reasons described above, petitioner has failed to demonstrate that the state

10   courts' decision on his claims is an unreasonable determination of the facts under § 2254(d)(2).

11   *See Schriro*, 550 U.S. at 481.  Accordingly, an evidentiary hearing is not necessary or

12   appropriate in this case.

13   **VI.  Conclusion**

14           For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

15   application for a writ of habeas corpus be denied.

16           These findings and recommendations are submitted to the United States District Judge

17   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

18   after being served with these findings and recommendations, any party may file written

19   objections with the court and serve a copy on all parties.  Such a document should be captioned

20   "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

21   within the specified time may waive the right to appeal the District Court's order.  *Turner v.*

22   *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In

23   his objections petitioner may address whether a certificate of appealability should issue in the

24   event he files an appeal of the judgment in this case.  *See* Rule 11, Federal Rules Governing

25   ////

26   ////

1  Section 2254 Cases (the district court must issue or deny a certificate of appealability when it

2  enters a final order adverse to the applicant).

3  DATED:  September 26, 2012.

4

                              EDMUND F. BRENNAN
5                             UNITED STATES MAGISTRATE JUDGE

47